THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | 4:22-cr-00675-RLW |
| DARRELL SANDERS | ) ) ) | |
| Defendant. | ) ) | |

### DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST TO IMPOSE A SENTENCE AT THE STATUTORY MINIMUM

NOW COMES the Defendant, DARRELL SANDERS, by and through his attorney, Scott J. Krischke, Assistant Federal Defender, and offers this Sentencing Memorandum and enclosed exhibits to aid this Court in imposing a fair and reasonable sentence in this case. Mr. Sanders states that his lawful guidelines range is 97 to 121 months but notes an agreement with the Government to jointly recommend a variance, **which would place his range at 70 to 87 months**.[1] Mr. Sanders requests this Court to consider his history and characteristics, including the loss of multiple close family members in the months leading up to the offense conduct. Held against a critical analysis of some of the guidelines enhancements and custody issues here, there are ample factors pursuant to 18 U.S.C. 3553(a) that makes a sentence at the mandatory minimum of **60 months** incarceration an appropriately severe consequence and punishment for his conduct.

IN SUPPORT of this Motion, Defendant states:

---

[1] *See* Guilty Plea Agreement, **Doc. 41**, p. 2. The Government and Mr. Sanders agreed that a downward variance should be applied as the initial guilty plea agreement assigned a two-level enhancement pursuant to 2G2.2(b)(7)(A) as to number of images. This is explained in further detail in Section III of this sentencing memorandum. For its part, the Government contends that his sentencing range should be seen as 121 to 151 months. Final PSR, **Doc. 65** at ¶100.

I.     LOSS AND DESPAIR

Darrell Sanders can still recall the moment he picked up a call from his mother on a cold morning in early December 2020. His mom was hysterically crying and speaking a mile a minute. When Darrell was finally able to calm her down, she dropped the explosive news: Darrel's younger brother Kevin Sanders was brutally murdered in a home invasion the night before. **<u>Exhibit A</u>**, Kevin Sanders Murder news articles.

Darrell was in a fugue state of shock. Growing up, he and his little brother held the strongest bond between them of anyone in their family. Darrell, Kevin and their youngest brother Levi did not have the easiest childhood growing up. For as far back as he can remember, his mother and father were consistent opiate pharmaceutical drug abusers. While his parents took care to try and hide it from their sons, the effects of the constant cycle of drug binges followed by the bottoming out of withdrawal were impossible to hide. The family was constantly on the move, never staying at one location very long as they fought with landlords and struggled to maintain a home while jointly maintaining a severe drug addiction. They would leave their kids alone often for days at a time with no indication when – or if – they would come back.

"Kevin was always my little brother, he was like my partner, and when my parents would just take off, sometimes for days, it fell on me to care for him and look after him," Darrell said.[2] "After Levi was born it was like he became our shared responsibility."

Darrell's neglectful upbringing affected him on nearly every level. His parents' constant absence left him in repeated "survival mode" for him and his two younger brothers from a very young age. Their transient nature meant Darrell was never able to establish community support or even basic friends.

---

[2] All quotes from Darrell Sanders are taken directly from interviews with Counsel.

"I remember, I felt quite abandoned. Unlike other kids, I couldn't just go to my parents for things like life advice, or even like help with my homework … even like a hug if I felt sad, those things were just largely not there," Darrell recalled. "I didn't have a lot of friends social either, because it was like I would either be too embarrassed to invite them to where we lived … and I knew that we would just be moving anyway in the next year, so I eventually just sort of gave up."

To make matters worse, at the times he would grace the family with his presence, Darrell's father would physically abuse his sons on a routine basis. "I remember he had a thing where, if one of us did not fess up to doing whatever bad thing he thought we did, he would beat all of us," Darrell said, "and since I was the oldest, I would get it first. So I just started taking it so that my little brothers wouldn't have to."

The totality of his early family life left Darrell feeling like an outsider. He developed severely low self-esteem. But not in every way. That he stepped up to care of his little brothers and deep bond he forged with Kevin gave him a sense of purpose and pride.

Finally things got so bad at home, Darrell and his brothers were sent to live with his grandmother, Susan Moss. Life with Grandma was a world apart. Her refrigerator and pantry was always full, where his own mother would regularly barter away their meager food stamps for drugs. His grandmother was warm, kind and caring where his parents were neglectfully absent at best and physically abusive at worst.

"In retrospect, that meant everything in the world to me, to have someone that was stable and safe, where I felt loved, cared for … I had a clean house to come home to that actually had food for us to eat," Darrell added. "Kevin and me, we really knew how important that was after what we went through together."

In the subsequent years, Darrell and his brothers bounced back and forth between their grandmother and parents. When Darrell's father died from unknown complications in 2009, Darrell was 14-years-old. Within months, his mother was with a new partner: Scotty Hand. An addict with a long rap sheet of drug possession charges and state prison terms, Darrell described his mom's live-in boyfriend as routinely abusive towards the boys and the cycle continued. **Exhibit B**, Scotty Hand criminal records.

Hand's influence also seemed to affect Darrell's mom, he explained, as shortly after they got together, she was convicted of two felonies of her own and ultimately sentenced to a 120-day shock term. **Exhibit C**, Lorrie Sanders criminal records.

With the young boys mother becoming incarcerated they stayed with family, but were always partial to their grandmother who represented an island of warmth and security in a chaotic world brought on by their primary guardians' unceasing and severe addictions and criminal behavior that consumed their entire lives.

More than a decade later, in the wake of Kevin's murder, Darrell found himself redefining the parameters of his family. His mother – who had finally achieved sobriety after her incarceration – now leaned heavily on Darrell for support as she grieved the loss of her son.

"I just had all these people around me who kind of looked to me, so I felt like I had to hold my emotions back, I put myself in a place of support," he recalled. "But seeing all of their emotional reactions and not being able to let myself respond really affected me."

Misery loves company, and in a cruel twist of fate, just two months after Kevin's loss, his grandmother passed away from natural causes. **Exhibit D**, Susan Moss obituary.

"That was extremely hard, my grandma was the only safe person I know, like Kevin was the only person I knew who I connected with," Darrell recalled. "So in that moment, I knew that I was fully alone and I had didn't have any idea how to comprehend that or make sense of my life."

## II.    SPIRAL

Unable to process the deaths of his little brother and loving grandmother in rapid succession and bereft of the financial resources to get proper therapy, Darrell took to alcohol to soothe his feelings of emptiness and sorrow.

Before these events, Darrell had been at most a social drinker – and an inconsistent one at that. But he quickly went from heavy drinking on the weekends, to every drinking on the weekdays, to having alcohol in his system virtually every waking hour as he sought to numb himself from his severe depression.

Along with his addictive turn to alcoholism came a spike in consumption of pornography. This newly-metastasized dependence on pornography had very specific roots for Darrell.

When he was about 8, in the thick of his parents' neglect and abuse, Darrell had a brief friendship with a young boy around his age on his block. Darrell's mother and the boy's father worked together, so the two would often spend time with one another visiting each other's houses.

On one of these visits, the young boy aggressively initiated sexual contact with Darrell.[3] "While it was shocking to me, it was also kind of exciting … I'd never really had any idea of sexuality before that," Darrell remembered. "All I knew is that it made me feel gratified, not necessarily sexually, but that I have this person who wants my touch, who wants to touch me."

"And with how often I was left totally alone, that feeling was different but it felt good, like somebody desired my intimacy and desired to show me intimacy and not just leave me abandoned."

The two had a multitude of encounters, all consensual. While having these experiences, Darrell discovered his father's (legal) pornography stash and would routinely sneak watching videos or looking at magazines in his room at night.

---

[3] *See* PSR at ¶60.

As he grew into an adult, Darrell developed a dependence to the consistency and stability of pornography, consuming "normal, lawful" pornography through his teen years and into his adult years.

But in the avalanche of self-medication and suppressed emotions resulting from the loss of his brother and grandmother, his pornography habits began to change. For one, his consumption became more frequent. It also began to change rapidly.

Darrell recalls scrolling through a whirlwind of different kind of pornography, looking for something that could comfort his increasingly desperate and flailing state. In early 2022, he found that release in internet chat rooms in which consenting adult users would role play as children engaging in sexual conduct with other children.

"And all of those feelings I had as a kid, that first sexual experience with my friend, that all came rushing back to me," Darrell said. "Now that I have had time to reflect on everything, it is clear to me that it brought me all the way back to that first feeling where for once I felt wanted and deserving of intimacy."

In time, Darrell witnessed chat room users sharing images of child pornography. In that moment, Darrell took photos and short videos of a few of those still images and saved them to his phone - a demonstration of his primitive understanding of how these illegal images and videos are typically acquired and shared by more methodical and advanced offenders.

"I knew in doing that it was wrong, something I shouldn't be doing, I just got carried away in that moment," he said, adding, "and I wanted to tell someone, to try and figure out what is going on with me, I knew it was coming from some bad place, but I was too embarrassed to reach out to anyone."

"I didn't even know who I could reach out to with this problem."

Less than two weeks after saving the photos and short one-second videos of some of the images, his self-destructive spiral of alcoholism combined with his desperate and misguided search for intimacy in the wake of immense tragedies, he was arrested in connection with this offense.

"I've heard a lot of people talk about a 'cry for help,' and when I think back about shouting out at those kids, that's all I can think to explain why I would do something like that," Darrell said, recalling that he had a few drinks and smoked marijuana prior to these encounters. "In my mind, I never had any intention whatsoever on acting on anything, let alone going so far as to logically consider that someone might say yes to me … It felt sort of mischievous, but I still find myself so confused as to what I thought I was going to accomplish."

Since his arrest, Darrell has spent a large amount of time reading his Bible and searching his feelings to identify who he is and come to terms with who he will be legally branded as for the rest of his life. His incarceration has also meant the elimination of alcohol and marijuana in his life which has sharpened his focus and allowed for more honest self-reflection.

"I've done a lot of personal soul-searching and taking inventory of my life and history, to try and root out why I would have done this to myself," he said, noting correctly that there is no psychological counseling available to him at his county facility. "I hate myself for what I did, that something I did just flippantly, I recognize it caused them to feel afraid and I suffer with that every day of my life."

"I know that deep down I'm not a monster, I'm not this cartoon of a guy in a van driving around looking for kids, and I know that I will need to spend the rest of my life showing that through my actions."

### III. UNCOUNTED TIME, INFLATED GUIDELINES, DENIED OPPORTUNITIES

#### a. *Primary State Custody*

Darrell Sanders has been in continuous custody since his arrest on April 13, 2022. Because Mr. Sanders was repeatedly refused bond in state Court, that period, stretching nearly 27 months as of the scheduled date of his sentencing is time spent in primary Missouri state custody. **Exhibit E**, State Order Denying Bond.

U.S.S.G. §5G1.3(c) requires any federal sentence to run concurrent to any anticipated state term of imprisonment.[4] However, if this Court adopts the report's recommendation and the Guidelines provision to run this concurrent to the relevant conduct in the state iteration of this offense, this does not necessarily mean that these 27 months spent in primary state custody will be applied to his federal term.

The Bureau of Prisons ("BOP") has expressed its legal opinion that, "(t)he earliest date a federal sentence can commence is the date it is imposed. Thus, a concurrent sentence commences on the date of its imposition; not on the date of commencement of prior sentence, or some earlier date." **Exhibit F**, BOP Sadowski Memorandum, p. 2.

Counsel has had numerous conversations with his counterpart in St. Louis County representing Mr. Sanders on his open case there for relevant conduct: the state has made no indication it intends to dismiss any charges against Mr. Sanders and their repeated objections to allowing Mr. Sanders to be released from primary state custody to come to primary federal custody further belie their intention to pursue their prosecution.[5] It cannot also guarantee that if he is convicted and receives a sentence in that state matter, if the state court will agree to run that sentence concurrent to the federal sentence.

---

[4] *See* PSR, ¶76.
[5] *See id*. at ¶54.

This case does not fall into the category outlined by 5G1.3(b), which would require a downward adjustment "for any period of imprisonment already served on the undischarged term of imprisonment" for relevant conduct as a state sentence has not yet been imposed. However, 5G1.3(d) authorizes broad judicial discretion of imposing terms of sentences to "achieve a reasonable punishment for the instant offense." See also U.S.S.G. §5G1.3, app. n. 4(e).

Therefore, this Court should consider the 27 months' incarceration spent entirely and continuously in state custody – that the state has intransigently refused to lift despite multiple requests to allow for Mr. Sanders placement in primary federal custody – as a factor pursuant to 3553(a) in pronouncing an appropriate sentence that reflects the situation that Mr. Sanders likely spent 27 months of time for relevant conduct that cannot be applied to his federal sentence under BOP guidelines and interpretation.

### b. Inflated Guidelines

As part of its plea agreement, the Government and Mr. Sanders considered the fact that several of the "videos" that Mr. Sanders possessed were two-second recordings of a still image and a large number of the files were duplicate copies. Despite the state of the law dismissing such legal objections to the increased enhancements for duplicate images and "videos" consisting of a single, unmoving image, the Government and Mr. Sanders that this unique circumstance of the nature of the images and videos did not justifiably rise to a five-level enhancement pursuant to 2G2.2(b)(7)(D) and therefore agreed that this enhancement should be two levels pursuant to 2G2.2(b)(7)(A). As previously stated, the plea agreement reflects this commitment in the event that the greater enhancement is applied by Probation. **Doc. 41**, p. 2.

Apart from the Government's gracious mutual understanding that the greater enhancement does not reflect the conduct at bar in terms of images, a number of troubling matters persist with the 2G2.2's

specific offense characteristic enhancements. Advocacy groups and legal scholars have consistently denounced the present scheme laid out in 2G2.2 for non-production child pornography cases, particularly drawing attention to its highly draconian guidelines provisions.

One such study looked at number of obsolete and outdated enhancements that are effectively automatically applied to all defendants given the evolved nature of the offense in the era of technology and the Internet. **Exhibit G**, Brent E. Newton, *A Partial Fix of a Broken Guideline: A Proposed Amendment to Section 2G2.2 of the U.S. Sent. Guidelines*, 70 CASE W. RSRV. L. REV. 53 (2019). Other recommendations included narrowing the four-level "sadistic or masochistic conduct" enhancement that presently applies any penetration of a pre-pubescent minor to *per se* trigger the enhancement, which, according to the study's review applies in virtually all modern cases. *Id*. at 67. It further goes on to dissect the value of the "number of images" enhancement in general, likening these enhancements to the "automatic" application to virtually all cases just as in the use of a computer or "sadistic or masochistic" enhancements. *Id*. at 69.[6]

It cannot be said that actions taken by virtually every defendant who commits these offenses in line with standard, modern technological advancements deserve multiple levels in aggravation. If so, the base offense level would be raised to streamline the process. It also cannot reasonably be argued that today, in 2024, a person who uses a computer or digital device to possess images – the primary way virtually all Americans stores image files today – represents a substantial greater threat to society.

Taken together, these enhancements – all of which are applied against Mr. Sanders – amount for a staggering additional 11 levels to his guidelines calculation. Reducing this from his present offense level of 30, he would see his range decrease from 97 – 121 months all the way to 30 to 37 months.

---

[6] The study goes on to note that 69.1 percent of defendants in non-production child pornography cases receive downward variances "based on sentencing judges' subjective senses of what appropriate sentences should be." *Id*. at 53.

   c. *Merit Credit Unavailable*

For most federal inmates, the First Step Act of 2018 offers a rare lifeline to allow them to receive up to a year off their sentence in exchange for participation in certain programming. As Mr. Sanders entered into two counts of violations of 18 U.S.C. §2252A, he is expressly prohibited participating in First Step Act programming and therefore forbidden from receiving any earned time credit against his sentence. **Exhibit H**, BOP First Step Act disqualifications.

Despite Mr. Sanders' well-documented struggles with alcohol and marijuana directly contributing to his commission of this offense he will likewise not be eligible for participation in the Residential Drug Abuse Program ("RDAP"), as the offense conduct involved the possession of images depicting sexual exploitation of children. **Exhibit I**, RDAP Ineligibility. Therefore, he is additionally foreclosed from earning time off of his sentence for participating in such anti-recidivist programs.

The stigma associated with this form of conviction carries over to programming and results in the foreclosure of opportunities to earn time off a person's sentence, ensuring that whatever sentence this Court imposes on Mr. Sanders will be served without any merit-based credits applied whatsoever.

## Conclusion

Darrell Sanders is in the extremely unenviable position of having served more than two years in primary state custody for relevant conduct that, despite being mandated by the federal guidelines to run concurrently, has absolutely no guarantee that it will be applied as such by his primary state jurisdiction and BOP's own stated guidelines regarding how it calculates prior time incarcerated. *See* ***Ex. F***.  He is subject to a massively inflated offense level, even before the contested pattern of conduct enhancement,[7] resulting from section 2G2.2 that has been criticized by legal academics and federal judges alike as

---

[7] *See* **Doc. 62**.

overly draconian and not reflective of the general dangerousness or culpability of these offenders and their crimes. *See* **Ex. G**. He will likewise not see any lifelines in BOP programming, as his offense of conviction bars him from participation in anything related to earned time credit. This Court should consider all of these factors in determining an appropriate sentence here.

Darrell Sanders has genuinely expressed an enormous degree or remorse for his actions since the day of his arrest. While he understands that the passing of his grandmother and murder of his brother followed by his desperate and self-destructive downward spiral does not excuse his behavior, it does help to explain it. Compared with so many others, he possessed relatively minimal quantities of material and clearly demonstrated a very primitive understanding of the more methodical and advanced ways other offenders collect this content. Darrell has taken a number of steps already designed to focus in on the root causes of his behavior and a sentence of five years imprisonment followed by supervision and sex offender registration requirements and limitations is severely sufficient to comply with the needs of sentencing.

WHEREFORE, Mr. Sanders recommends a sentence of 60-months incarceration.

Respectfully submitted,

/s/ Scott J. Krischke
SCOTT J. KRISCHKE
Assistant Federal Defender #5015771 NY
1010 Market Street, Suite 200
St. Louis, Missouri 63101
Telephone: (314) 241-1255
Fax: (314) 421-3177
E-mail: Scott_Krischke@fd.org
ATTORNEY FOR DEFENDANT

### CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2024, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's Electronic Case Filing system to Assistant United States Attorney Nathan Chapman.

/s/Scott J. Krischke
SCOTT J. KRISCHKE
Assistant Federal Defender